# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KRYSTYNA PAJAK,

                    Plaintiff,

        v.

JOHN E. POTTER, POSTMASTER
GENERAL, U.S. POSTAL SERVICE,

                    Defendant.

Civ. Action No. 05-4622 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

This is an employment discrimination lawsuit brought by a former letter carrier, Krystyna Pajak, against her ex-employer, the United States Postal Service ("USPS" or the "Postal Service"). Although Pajak originally proceeded *pro se*, prior to the commencement of discovery the Court appointed *pro bono* counsel (D.E. 22) who is representing her in opposing the pending motion (D.E. 49) in which Postmaster General John E. Potter, as head of the USPS (hereinafter referred to institutionally as the "Postal Service"), moves for dismissal under Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(c). Earlier in the case, Potter had filed a pre-answer motion to dismiss, which was denied as premature. (D.E. 16.) At that time, the Court concluded that "[g]ranting a motion to dismiss before the defendant takes a position on responsibility for the actions does not do justice." (D.E. 9.) Discovery is now complete and Magistrate Judge Shwartz has entered a final pretrial order. (D.E. 57.)

The Postal Service argues for summary judgment on the grounds that Pajak's claims are time-barred because she did not file her civil complaint within the required 90-day time period;[1] because she did not timely exhaust her administrative remedies with respect to certain allegations in her complaint; and because her allegations relating to a January 5, 2004 "notice of removal"[2] were settled during the administrative process.  The Postal Service also argues that Pajak's claim for compensatory damages under the ADEA should be dismissed because plaintiff has not alleged a discrete adverse employment action, and because compensatory damages are not available under the ADEA.  The Postal Service also maintains that Pajak cannot state a claim for retaliation for discipline issued prior to January 5, 2004; that Pajak is not entitled to a jury trial for her ADEA claims; that Pajak's complaint based on the Rehabilitation Act should be dismissed due to inability to show a violation; and that various other allegations in the complaint that fail to allege discrimination must be dismissed.

## I.        FACTUAL BACKGROUND

Pajak is a 58-year old female Polish immigrant who was employed as a letter carrier for the U.S. Postal Service in Summit, New Jersey from January 2002 to January 2006, when she was approved for disability retirement, on which she remained at the time briefing was submitted.  (Certification of Krystyna Pajak ¶¶ 3, 4, 5, 150. (hereinafter, "Pajak Cert.").)  Pajak's

---

[1] On May 28, 2008, the Postal Service submitted a letter (D.E. 50) withdrawing point III in its memorandum in support of its motion to dismiss.  Point III is entitled "Plaintiff Cannot Claim Retaliation Under the ADEA." Accordingly, the Court does not consider those arguments for dismissal in deciding this motion.

[2] With respect to federal government employees, pursuant to 7 U.S.C. § 7513, a notice of removal is a procedural requirement that must be afforded to "[a]n employee against whom an action is proposed," and which is accompanied by safeguards of generally "30 days' advance written notice," a "reasonable time . . . to answer orally and in writing and to furnish affidavits," the right to "be represented by an attorney," and the right to "get a written decision at the earliest practicable date."  7 U.S.C. § 7513.

suit is based on allegations of discriminatory actions beginning in May 2002 and continuing through June 2005.[3]

In her complaint Pajak contends that she was subjected to constant discrimination by four of her supervisors based on her national origin (Polish), her gender (female), her age (over 40), and a disability (a back injury suffered on the job). Pajak alleges that Postmaster Karp of the Summit Post Office "verbally abused and nearly tortured Ms. Pajak" on these prohibited grounds to the point that his "discriminatory behavior forced Ms. Pajak to suffer from severe depression and anxiety and seek a transfer out of her workplace due to the unrelenting harassment and discrimination." (Pajak Br. 1.) Pajak also claims retaliation against her for filing a discrimination complaint with the Postal Service's Equal Employment Opportunity Office ("EEO Office"). Plaintiff alleges, *inter alia*, that this discrimination and retaliation against her included: wrongful denial of sick leave; improper issuance of notices of suspension and removal; verbal abuse; disparate treatment in the context of job performance observation and evaluation by her supervisors; and disparate treatment regarding work assignments. Plaintiff claims that she is entitled to relief because she "is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the defendant's discriminatory [employment] practices." (Compl. ¶ 40.)

In the Court's earlier decision, it acknowledged that Pajak's *pro se* complaint was entitled to "greater leeway" with respect to "technical rules of pleading." (*See* D.E. 16 (citing *Tabron v. Grace*, 6 F.3d 147, 153 n.2 (3d Cir. 1993))). Because Pajak's *pro se* pleading consisted of grouped factual assertions and was not methodically organized by theory of liability, the Court construed the complaint to allege the following claims:

---

[3] During the period from June 2005 (when Pajak alleges the discriminatory acts ended), until January 2006 (when she received disability approval), Pajak was apparently not actively working for the Postal Service.

-3-

(1)     Defendant engaged in various unlawful, discriminatory employment practices based on plaintiff's national origin and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), plaintiff's age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. ("ADEA"), and plaintiff's disability in violation of the Rehabilitation Act 1973, 29 U.S.C. § 701, et seq. ("Rehabilitation Act");

(2)     Defendant engaged in various unlawful, retaliatory employment practices undertaken in response to plaintiff's filing of discrimination complaints with the Postal Service's EEO Office, in violation of Title VII, the ADEA, and the Rehabilitation Act; and

(3)     Defendant created a hostile work environment in violation of Title VII, the ADEA, and the Rehabilitation Act.

(D.E. 16.)  The Court will proceed in line with this characterization of the complaint's claims.

## II.   STANDARD OF REVIEW

The Postal Service moves for dismissal on the basis of Rule 12(b)(6), but invites the Court to convert the motion to one for summary judgment under Rule 56(c).  The Court opts to treat the current motion as one for summary judgment, making the broader record available as opposed to the limited pleadings.  While it is true that "all parties must be given the opportunity to present material to the court when the court converts a motion to dismiss into a motion for summary judgment," a court can do so if the "parties . . . have notice of the conversion."  *Razzoli v. Dir., Bureau of Prisons*, 293 F. App'x 852, 855 (3d Cir. 2008).  Because it is clear that Pajak drew from an expanded record in opposing the motion, the Court will address the motion as one for summary judgment.

Summary judgment may be granted under Rule 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court is duty-bound to "view the facts in the light most favorable to the non-moving party and [must] draw all inferences in that party's favor."  *Gray v. York Newspapers*, 957 F.2d 1070, 1078 (3d Cir. 1992).  Summary judgment is inappropriate if there is evidence sufficient to

-4-

allow a reasonable jury to return a verdict for the non-moving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), or if the factual dispute is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* The movant's burden, however, "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Additionally, the non-movant "may not rest upon mere allegations or denials of the . . . pleading"; instead, the non-movant, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

On this summary judgment motion, the record consists of Pajak's 150-paragraph detailed certification dated July 3, 2008 submitted with her opposition papers; deposition transcripts of Pajak and her Postal Service superior John Karp; as well as deposition transcripts of her co-workers, Allan Axelrad, Linda Reszutek, and Bayyinah Nashid. The record before the Court also includes Pajak's medical records and psychological counseling records, her EEO administrative complaints, and her EEO Investigative File.

## III. DISCUSSION

### A. The 90-day Time Period for Filing

The Postal Service argues that Pajak failed to sue within 90 days of receipt of a right-to-sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC"). In so doing, the Postal Service revisits an issue already decided by the Court's October 30, 2006 ruling on the first motion to dismiss, where, over the same objections, it found the complaint was timely:

> Plaintiff filed a complaint in district court, along with an application to proceed *in forma pauperis* ("IFP"), on September 23, 2005 − 87 days after her attorney received the Postal Service's final decision. Plaintiff did not pay the required $250 filing fee at that time. This Court denied plaintiff's IFP application

> in an order dated October 18, 2005 and, as a result, the case was terminated. The case was re-opened nine days later on October 27, 2005 after plaintiff paid the $250 filing fee.
>
> Although it is unclear exactly when plaintiff received the Notice of Final Decision, plaintiff is deemed to have received the notice on the date that it was received by her attorney. *Irwin v. Dept. of Veteran Affairs*, 498 U.S. 92, 92-93 (1990). Thus, the 90-day clock started to tick no later than the date her attorney received the notice, June 28, 2005, meaning that plaintiff's complaint was not timely filed if it was filed after September 26, 2005.
>
> Plaintiff filed a *pro se* complaint on September 23, 2005, but did not tender the $250 filing fee until October 27, 2005. Defendant argues that the complaint must be dismissed in its entirety as not timely filed because the 90-day period elapsed between the Court's denial of plaintiff's IFP application on October 18, 2005 and payment of the filing fee on October 27, 2005. This legal position is surprising in the face of Third Circuit precedent that compels the opposite result.
>
> . . .
>
> This precedent makes it plain that when plaintiff paid the filing fee on October 27, 2005, her complaint was deemed filed on September 23, 2005, which is timely because her time to file a complaint in district court did not expire until September 26, 2005.

(D.E. 16.)  Nothing put before the Court calls for a different ruling here, and, thus, the earlier determination of timeliness stands as law of the case.  *See Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003) ("The law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation.").

### B. The Postal Service's Arguments Concerning the Timeliness of Pajak's Exhaustion of Administrative Remedies:  ¶¶ 7-16; 28-29, 33-34 of the Complaint

The Postal Service contends that Pajak failed to exhaust her administrative remedies with respect to ¶¶ 7-16; 28-29, 33-34 of her complaint.  In support of dismissal, the Postal Service argues that because certain allegations refer to events that occurred more than 45 days prior to the date of Pajak's first EEO complaint to an EEO counselor, then those allegations must be time-barred under 42 U.S.C. § 2000e-16; 29 C.F.R. § 1614.105(a)(1).  (Potter Br. 5.)  The Postal Service also contends that Pajak earlier failed to raise with the EEOC "many of the allegations" in her complaint, requiring that they be "stricken."  (Potter Br. 6.)

These are the allegations:

Paragraph 7: In May 2002 – Supervisor Bruce Olivier screamed at Plaintiff and state [sic] that she was too slow and threatened to fire her. The Plaintiff was the only woman over 40 years of age who worked under Supervisor Olivier.

Paragraph 8: In June 2002, Supervisor Olivier screamed at plaintiff for no reason. The plaintiff reported the incident to the Postmaster.

Paragraph 9: In August 2002, Supervisor Olivier screamed at plaintiff and told her to get off the floor.

Paragraph 10: In November 2002, the plaintiff requested Route 6. Plaintiff was not given Route 6, the defendant gave Route 6 to another worker. Defendant treated male workers better than the plaintiff, the only female over 40 years of age.

Paragraph 11: In December 26, 2002 – January 5, 2003, the Supervisor refused to give the plaintiff one day off. The plaintiff's co-workers were given days off.

Paragraph 12: On March 11, 2003, plaintiff was given Route 27 in which she was trained for one year prior. Other carrier trained on their routes 3 to 4 times before being assigned.

Paragraph 13: On July 13, 2003, Plaintiff was forced to work ten days after katarization [sic] (heart) surgery.

Paragraph 14: On October 29, 2003, plaintiff was assigned Route 31. Postmaster Karp and Allocco stared at plaintiff. Postmaster Alloco screamed at plaintiff for no reason.

Paragraph 15: On December 15, 2003, plaintiff was given a Notice of Suspension based on false reasons.

Paragraph 16: On December 22, 2003, plaintiff's daily reports contained false information.

Paragraph 28: On November 17, 2004, Supervisor Lamers informed plaintiff that disciplinary action will be taken against plaintiff.

Paragraph 29: On December 14, 2004 Supervisor Lamers gave plaintiff a notice of Suspension for 14 days.

Paragraph 33: On January 27, 2005, Supervisor Lamers changed plaintiff's schedule without informing her. Plaintiff was required to ask permission to pick up mail from hot case and rack.

Paragraph 34: On June 2005, plaintiff requested 200 hours of sick days. The Defendant disapproved plaintiff's request for no reason.

(D.E. 1. (Compl. ¶¶ 7-16; 28-29, 33-34).)

The record indicates that Pajak initiated the EEO complaint process on January 5, 2004, when she requested an appointment with an EEO dispute resolution specialist.  (Exh. A, Jan. 2004 EEO Information for Pre-Complaint Counseling Form, Affidavit of Mitchell Sturman ("Sturman Aff.").)  Pajak filed her first EEO complaint of discrimination on January 14, 2004. (Exh. A, Sturman Aff.)  On her January 2004 EEO pre-complaint counseling information form, Pajak stated that she believed she was being discriminated against on the bases of her age (53 at the time), her national origin of Poland, and her gender.  (*Id.*)  Complaining of scheduling inequities and unfairness in pay, Pajak identified her desired resolution on that form:  "I want to be treated like all others [sic] letter carriers and I deserve to work without excess stress or harassment."  (*Id.*)  Pajak admits that her efforts on January 5 and 14, 2004 were her first instance of complaint to the EEOC.

Pajak also filed a more comprehensive EEO pre-counseling complaint form on October 21, 2004, which detailed events supporting her allegation of a hostile work environment.  (Exh. D, Oct. 2004 EEO Information for Pre-Complaint Counseling Form, Sturman Aff.; Pajak Dep. 54:8-24.)  Pajak recounts that Postmaster Karp "publicly humiliated [her] while talking . . . about how [she] spent [her] first uniform allowance" by calling over a letter carrier of Polish descent—who did not speak Polish—to "come over and translate to [her] what the postmaster just said which [she] already fully understood."  (Exh. D, Sturman Aff.; Pajak Dep. 54:8-24.)  Pajak also describes how, on December 24, 2003—well within 45 days of her January 14, 2004 EEO contact—she was told she would be working on Christmas Day 2003, whereas other letter

carriers were told of their December 25 work scheduling "the previous week."  (Exh. D, Sturman Aff.; Pajak Dep. 99:7-100:1.)

While it is correct that a plaintiff alleging discrimination on the basis of race, color, religion, sex, age or handicap is generally required to contact an EEO counselor to attempt informal resolution prior to filing a complaint, and that such contact must be made within 45 days of the discriminatory/unlawful act, those constrictions are not applicable in every case. Under 29 C.F.R. § 1614.105(a)(2), if Pajak can show she was never notified about the 45-day time limit, then her allegations will not be time-barred for her failure to contact an EEOC counselor within 45 days.  Pajak seeks to toll the 45-day limitations period because she is an immigrant and not a native English speaker, was not represented by an attorney, and believed she was properly protecting her rights by contacting her union representative Owen Seidenberg prior to contacting the EEOC.  (Pajak Cert. ¶¶ 13-16, 78-80.)  Once she became aware of the EEO process, it is manifest that Pajak did not slumber on her rights -- she pursued the process to file an EEO complaint.  The Court finds merit in Pajak's argument for tolling the 45-day period based on *Bronze Shields, Inc. v. N.J. Dep't of Civil Serv.*, 667 F.2d 1074, 1081 (3d Cir. 1981), where the Court stated "[t]he liberal application of the congressionally mandated filing period is consistent with the remedial purposes of Title VII and the liberal interpretation to be given to all Title VII provisions."

Pajak also asserts that the "continuing violation" theory shields her suit from the 45-day limitation.  The "continuing violation" theory is an exception to the statutory filing limitations under Title VII, in which a plaintiff can complain of a continuing series of employer actions conducted pursuant to a policy or practice of discrimination if the plaintiff timely files a complaint as to one of the employer actions.  *Shenkan v. Potter*, 71 F. App'x 893, 894-95 (3d

Cir. 2003) (describing the doctrine as "an equitable exception to the timely filing requirement that applies when a defendant's conduct is part of a continuing practice" (internal quotations omitted)).  "In order to establish a continuing violation, the plaintiff must 'demonstrate that at least one act occurred within the filing period,' and that the employer's actions were 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'"  *Id.* at 895 (quoting *West v. Phila. Elec. Co.*, 45 F.3d 744, 754-55 (3d Cir. 1995)).

The evidence adduced in the record, which corresponds to Pajak's allegations, supports that she was subjected to ongoing rather than sporadic discrimination based on gender, national origin and age, certain instances of which occurred within the 45-day filing period leading up to January 14, 2004.  Indeed, the heart of Pajak's case is that she was forced to endure a hostile work environment with the Postal Service.  Moreover, even among the specified allegations targeted by the Postal Service, Pajak does allege (in ¶¶ 15 and 16) discriminatory acts occurring on December 15 and 22, 2003, both within 45 days of her initial EEO contact.  (*See* D.E. 1, Compl. ¶¶ 15-16.)

When hired, Pajak was the oldest female letter carrier working under supervisor Bruce Olivier. (Compl. ¶ 7.)  In her sworn affidavit and deposition testimony, Pajak has recounted that Oliver repeatedly berated her, screamed at her for being too slow, threatened to fire her in front of co-workers in May, 2002 (Pajak Dep. 46:14-47:14; Pajak Cert. ¶ 21), screamed at her the first time she conducted a particular route so harshly that she could not drive her vehicle in June, 2002 (Pajak Cert. ¶ 22), and screamed at her after she finished her route to "get off the floor" in front of co-workers in August, 2002 (Pajak Cert. ¶¶ 23-24).  After the August 2002 incident, Pajak recalls that other co-workers expressed concern and sympathy for her.   (Pajak Cert. ¶ 25.) While the Court finds no independent corroboration of co-workers sympathizing on that

particular occasion, the record does show that co-workers remembered Pajak being reprimanded harshly and crying as a result.  (Reszutek Dep. 46:16-47:14; Axelrad Dep. 10:19-11:13; 23:13-24:16.)  According to Pajak, Olivier's humiliating treatment apparently continued regularly until his retirement in 2003.  (Pajak Cert. ¶ 28.)  From the record, then, Pajak's interactions with Oliver were neither isolated nor sporadic.

According to Pajak's deposition testimony, Postmaster Karp subjected Pajak to verbal abuse throughout 2003, screaming at her for being "too slow" and for being the "worst carrier" in the Summit post office, and would also stare at Pajak while she worked, causing her to develop a nervous tick and rash.  (Pajak Dep. 89:7-12; 93:16-20; Pajak Cert. ¶ 48, 51, 53.)  Pajak testified that, as with Oliver, Karp humiliated Pajak in front of her co-workers, causing her to cry, which was corroborated by co-worker Axelrad.  (Pajak Dep. 47:15-48:20; Pajak Cert. ¶ 58-59; Axelrad Dep. 23:13-24:16.)  As discussed *infra*, the record indicates that the verbal abuse of Pajak by Karp and other superiors was not confined to a limited time period and was not a rare occurrence.

There is evidence that Pajak was unsuccessful in her efforts to obtain time off to have an EKG test.  (Pajak Dep. 42:22-43:3.)  During the summer of 2002, Pajak's family physician, Dr. Joseph Ballaro, insisted that she get an EKG and immediately see a cardiologist. (Pajak Dep. 44:21-45:1; Pajak Cert. ¶ 36.)  Pajak's requests for even a few hours off to see her cardiologist were denied, forcing her to cancel several appointments.  (Pajak Dep. 44:13-20; Pajak Cert. ¶¶ 37, 40.)  Pajak sets forth in her certification that a later-hired, part-time letter carrier—Yvette— was granted time off for holidays.  (Pajak Cert. ¶ 39.)  After having no days off in 2002, in early 2003 Pajak's doctor demanded that an EKG not be put off any longer.  Within months, Pajak underwent catheterization surgery.  (Pajak Dep. 44:25-46:3; Pajak Cert. ¶¶ 42-45.)  While Pajak

was recovering, she attests that Postal Service supervisors called her at home and told her to come back to work. (Pajak Cert. ¶ 46.) Shortly after she went back, Pajak states that she was made to work by herself on Sunday, July 13, 2003, even though it was the ordinary practice on Sundays for two letter carriers to work together. (Pajak Cert. ¶ 47.) In sum, as set forth in the record, the episode in which Pajak was denied time to tend to her medical needs was not composed of isolated or sporadic acts, but appears to have been a prolonged and interrelated pattern of events.

Based on Pajak's deposition testimony and certification, the Court finds good cause for tolling the 45-day period on grounds of Pajak's unawareness of the EEO procedure and her good faith efforts to complain through Seidenberg, her union representative. Once she became aware of the EEO grievance procedure, Pajak completed two pre-complaint information forms and several EEO complaints. Furthermore, as an independent basis, the 45-day period does not preclude Pajak's suit because she complained within 45-days of the last act before her EEO complaint, and the discriminatory conduct was not isolated or sporadic, but was rather continual and systematic, entitling Pajak to the shelter of the "continuing violation" theory.

Moreover, the Court concludes that, as an independent matter, Pajak permitted the EEO administrative process to run its course, as evidenced by the Postal Service EEO's Notice of Final Decision on June 24, 2005. (Exh. H, Sturman Aff.) Pajak did not abandon her administrative EEO remedy before filing a Title VII action in this Court. In adjudging that Pajak satisfactorily exhausted her administrative remedies, the Court observes that other courts have taken a similar view of exhaustion of administrative remedies. In *Saulters v. Nicholson*, the court found that "the exhaustion doctrine appears to require only that the administrative review process be allowed to proceed unhindered until completion," and that "ensuring that the agency

is given every opportunity to investigate and resolve the dispute is all that is intended by the exhaustion requirement." 463 F. Supp. 2d 123, 125 (D. Mass. 2006) (internal citations omitted). As there is no indication that Pajak's instant lawsuit—filed in late September 2005—materially interfered with, or that Pajak's actions hindered, the administrative remedial process, the Court finds that Pajak exhausted her administrative remedies before filing this civil action.

### C. Settlement of Plaintiff's Claims Related to the January 5, 2004 Notice of Removal

The Postal Service argues that Pajak's claims related to her January 14, 2004 EEO complaint must be dismissed on a Rule 12(b)(6) standard because they were settled on February 20, 2004 in the ADEA mediation agreement entered into by the Postal Service by Karp and Lamers in exchange for the Postal Service holding its January 5, 2004 notice of removal in abeyance. (Potter Br. 9.) The form settlement agreement shows that removal of Pajak from her position was held in abeyance for three months "to evaluate the progress made by [Pajak's] future performance" and states that "management" and Seidenberg, Pajak's representative, "will meet to review the work methods prescribed" and "will meet to establish the approximate number of mail containers . . . which translates to the minimum acceptable casing standards." (Exh. C, ADEA Settlement Agreement Form, Sturman Aff.)

Pajak argues that the settlement is without force because she did not participate in the settlement process, was urged to sign the agreement by Seidenberg, did not have counsel's advice, and believed it to be one-sided in providing her no consideration for her settlement of claims. (Pajak Cert. ¶¶ 85-90.) Pajak's principal argument, however, is that the Postal Service breached the settlement agreement in failing to hold meetings and discussions, despite her complaints to the union representative to that effect. (Pajak Cert. ¶¶ 91-92.) Citing 29 C.F.R. 1614.504(a), which states that "[a]ny settlement agreement knowingly and voluntarily agreed to

by the parties, reached at any stage of the complaint process, shall be binding on both parties," the Postal Service counters that the settlement is binding and that Pajak was obliged to seek an administrative remedy for non-compliance of settlement terms within 30 days under that regulation, which she never did.

The settlement agreement held the notice of removal in abeyance pending meetings and discussions with Pajak's supervisors concerning her job performance.  If it is believed that those subsequent meetings never occurred, then a settlement agreement that was not taken seriously enough by the Postal Service to abide by its terms cannot preclude Pajak's efforts to obtain redress here, especially where she was not counseled by an attorney.  What is more, Pajak's suit is premised on patterns of discriminatory conduct that occurred both before and after the February 20, 2004 settlement, making the purported settlement ineffectual to release any one, whole claim, whether under the ADEA or any other theory.   Accordingly, the purported settlement will not bar Pajak's case from going forward.

### D. Whether Pajak Can Make Out Title VII and ADEA Claims and Claims for Hostile Work Environment and Retaliation and Can Adduce Adequate Evidence in Support

To make out a *prima facie* claim of hostile work environment under the ADEA, Pajak must show that she is 40 years or older; that she "was subjected to harassment, either through words or actions, based on her age"; "the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile or offensive work environment"; and that there is "some basis for liability on the part of the employer."  *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996).

During all relevant times, Pajak has been over 40 years old – she was hired at age 51.  In the time leading up to Pajak's first EEO complaint in January 2004, Pajak testified that

Postmaster Karp had sarcastically called Pajak a "young lady" when reprimanding or correcting her in front of co-workers, remarking, "Young lady, you're not doing this right"; or, "Listen, young lady, you can't do that." (Pajak Dep. 48:18-24; Pajak Cert. ¶ 67.)  Pajak's September 8, 2003 promotion from part-time letter carrier to full-time was not made official until January 2004 but according to Pajak, her pay was never adjusted accordingly, unlike Justin Janvier, a younger carrier hired after Pajak who automatically received the full pay adjustment.  (Pajak Cert. ¶¶ 72-75; Pajak Dep. 51:20-52:5; 98:12-19.)   According to Pajak, despite her efforts to investigate by questioning Seidenberg, her pay adjustment was never made.  (Pajak Cert. ¶¶ 76-77; Pajak Dep. 98:20-23.)

After the February 2004 settlement agreement, Pajak was observed on her mail route on June 21 and 24, 2004 by Summit office supervisors, and on July 19, after returning from her mail route (Pajak Cert. ¶¶ 93-94), Pajak claims that Supervisor Lamers angrily told Pajak that she was the worst and slowest carrier in the office.   (Pajak Cert. ¶ 99.)   Shortly thereafter, Pajak contracted poison ivy, causing her to miss work on July 21 through July 24, 2004.  (Pajak Cert. ¶ 100.)  Although Pajak had a note dated July 20, 2004 from her physician, Pajak states that the Postal Service refused to pay her for the days she missed.  (Pajak Cert. ¶ 100; Affirmation of David Zatuchni, Esq. (Zatuchni Aff.), 7/20/04 Note of J. Ballaro, M.D., Exh. R.)  On August 2, 2004, while Pajak was sorting parcels, she states that Supervisor Lamers told her she was too slow in conducting her job duties.  (Pajak. Cert. ¶ 101.)  Also during August 2004, Postmaster Karp followed Pajak on her route more than once, although she claims she never received observation reports for these rounds.  (Pajak Dep. 73:23-74:15; Pajak Cert. ¶ 102.)  Pajak reports that she became "petrified" to go to work each day for fear of humiliation and harassment, despite her efforts to please management.  (Pajak Cert. ¶ 103.)

On September 22, 2004, Pajak injured her back while loading a mail truck from the platform (as opposed to loading from the ground).  (Pajak Cert. ¶ 96.)  Pajak was later issued a notice of removal on October 15, 2004 for her alleged failure to follow safety procedures weeks before on September 22, 2004, in that she did not back her truck up to the loading dock, leave space to stand on the ground between the truck and the loading dock, and load the truck from that position.  Instead, she stood on the loading dock and loaded her parcels directly from the loading dock into the back of the truck, which was situated flush with the loading dock.  (Pajak Cert. ¶ 106.)  According to Pajak, the manner in which she loaded the truck on September 22, 2004 was one of the normal manners of loading in the Summit office at that time (Pajak Cert. ¶ 114),  an assertion corroborated by three co-workers, Linda Reszutek,[4] Allan Axelrad, and Bayyinah Nashid.

With regard to truck loading procedures, Reszutek testified that "[e]veryone does it different" (Exh. H, Zatuchni Cert., Reszutek Dep. 15:7-14), and testified that she herself loads her truck from the dock instead of the ground.  (Reszutek Dep. 17:1-21.)  Letter carrier Axelrad, with 28 years on the job, testified that postal employees regularly load their trucks both ways, even up to the time of his deposition, and that he had never seen anyone get reprimanded or cited for loading the truck directly from the loading dock.  (Exh. G, Zatuchni Cert., Axelrad Dep. 40:8-44:12.)   And mail clerk Nashid, although admittedly not familiar with letter carrier procedure, testified that she had seen letter carriers "carry the mail and put it on the trucks from the dock." (Exh. J, Zatuchni Cert., Nashid Dep. 44:4-6.)

Although Pajak (Pajak Dep. 92:7-11), Axelrad (Axelrad Dep. 44:3-12), and Reszutek (Reszutek Dep. 20:14-17) recalled no previous training on loading a mail truck from the ground

---

[4] Linda Reszutek's maiden name was Percy.  All references in the record to Linda Reszutek or Linda Percy should be understood as referring to the same individual.  (Reszutek Dep. 4:6-10.)

(rather than from the dock), Pajak testified that one week after her injury, a safety training session was held about loading the truck from ground level.  (Pajak Dep. 92:7-11; Pajak Cert. ¶ 108.)   The record shows that Pajak's back injury affected her ability to stand for extended periods, walk, bend, and lift objects.  (Exh. W, Zatuchni Cert., EEO Investigative File at Exh. 23 pp.1-6.)  Dr. Dean Carlson, an orthopedist, evaluated Pajak and opined that her September 22, 2004 back injury was real and inflicted a "permanent partial medical impairment," and that the injury was the direct cause of work stoppages by Pajak on December 23, 2004, January 18 and 28, 2005.  (Exh. O, Zatuchni Cert., 3/2/05 Carlson Medical Records.)  In a March 2, 2005 letter, Dr. Carlson states that Pajak's back injury was permanent insofar as it had improved as much as it ever would, leaving her with an eight percent permanent impairment.  (*Id.*)

On October 1, 2004, Pajak recounts that Karp told her the impending transfer she was seeking would be "cancelled" and that Pajak "would have a lot of trouble" if she persisted with complaints of her back injury.  (Pajak Dep. 56:23-58:11; Pajak Cert. ¶ 112.)  On October 4, Pajak was informed that she would be punished for failing to follow instructions about how to safely load a truck, which was followed by the notice of removal on October 15, 2004, for her failure to obey safety procedures on her date of injury.  (Pajak Cert. ¶ 114.)  Soon thereafter, on the morning of October 21, 2004, Pajak told Postmaster Karp that her doctor required an MRI exam, at which Karp reportedly "exploded" and shouted at Pajak, calling her a "crook" more than once.  (Pajak Cert. ¶ 116.)  Pajak claims that each time she would approach Karp or Lamers regarding injuries, they would "yell" at her.  (Pajak Cert. ¶ 117.)

At his deposition, Postmaster Karp acknowledged that one of several factors bearing on his eligibility for an annual pay increase is the number of workplace injuries within the Summit facility.  (Exh. I, Zatuchni Cert., Karp Dep. 49:23-50:2.)  Summit postal employee Reszutek

testified that she had also been injured on the job and was also fearful of retaliation by Karp, stating that she "[h]ad her own problems with John Karp and [she] d[id]n't want to make them any worse." (Reszutek Dep. 24:4-20.)   Testimony of Reszutek and another Summit postal employee, Bayyinah Nashid, offers corroboration for Pajak's claim that Karp retaliated against employees injuring themselves in the workplace.[5]

_____

[5] Reszutek confirmed at her deposition that her relationship with Karp "completely" deteriorated following her workplace injury and that she was fearful to provide information in her deposition because "[she] ha[s] to see [Karp] every day." (Reszutek Dep. 25:3-14.) Reszutek admitted that Karp told her she is "useless" and, as he turned his back on her and walked off from a discussion, said something to the effect that he wished he could get "rid" of Reszutek due to her workplace injury. (Reszutek Dep. 26:3-27:1.) Reszutek also testified that Karp was "furious" when she said she needed to work only four hours per day when she was placed on light duty. (Reszutek Dep. 27:2-6.) In describing her interaction with Karp after her injury, Reszutek testified:

> Q. Did he assign you to extremely difficult job duties following your injury?
> A. I don't know that they were extremely difficult but the doctors had ordered that I wasn't to carry mail and he kept making me do routes I didn't know, on hills and things that were, you know, putting a strain on me rather than helping me get better.
> Q. He knew of your medical condition?
> A. Absolutely knew about it.
> Q. And yet he was having you do jobs that might hurt your medical condition rather than help you heal?
> A. Yes.
> Q. And you felt that was purposeful?
> A. I mean, I have my own route and rather than give me a piece of my own route that maybe had apartments where I would stand in one spot, he would give me pieces of routes I didn't know. I'm a regular carrier with my own route. I shouldn't be put on other people routes doing things I don't know.
> Q. So you had an established route that you were supposed to handle?
> A. Yes.
> Q. And he would give you other duties that you weren't even familiar with?
> A. Uh-huh. Yes.
> Q. And you felt that this was purposeful retaliatory conduct by him?
> A. Yes.
> . . .
> Q. You mentioned that Mr. Karp gave you routes that you weren't familiar with. Can you tell me other things that he did that you felt were retaliatory or harassing towards you?
> A. I can't even -- I just can't think of particular things. He just was not himself ever since that day, whenever I went in to -- I guess when my workman's comp was up and, you know, they sent me running around to all these doctors every two days, they never let me get any rest. And when I finally got an orthopedic surgeon who cut me back down to four hours, he was furious. And I had to go to physical therapy several times a week on their time, which they didn't like. And he said to me, well, what do you do with the rest of your day? And I said, you know, I'm in therapy those days. And he just went nuts, and since that day he doesn't speak to me. And for a while there, yes, they made me do other pieces of routes. They -- you know, I had doctor's orders of how many hours I could stand, how many hours I could sit. And you know, I was supposed to maybe have -- I forget the numbers but they have it all written down somewhere. Answer phones or whatever. But never, I would always have to stand in the same spot casing mail. And then doing those pieces of routes that I didn't know. And he just -- you know,

mumbling things under his breath when I'd walk by, dirty looks, you know, not the same.  Not --
totally not -- you would never believe that we were ever amicable the way he -- to this day he
won't look at me.

(Reszutek Dep. 27:7-31:4 (portions omitted).)  And Reszutek testified as to her perception—and that of her co-
workers—that Karp stood to gain or lose in a financial sense based on the amount of workplace injuries in the
Summit post office when she stated "[t]he big joke around the Post Office was that it effected [sic] his bonus . . . .
[A]ll of a sudden I walked in one day and he was furious when he brought in the doctor's note that cut me down to
four hours and gave it to him.  He just flew off the handle."  (Reszutek Dep. 27:7-31:4.)

Summit Postal employee Nashid tripped while performing sorting duties in the Summit post office on
October 5, 2004.  (Nashid Dep. 8:22-24.)  Regarding the incident and her subsequent treatment, Nashid testified:

Q. So take me through what happened.  You were working -- tell me from the beginning
to end; start at the beginning.

A. Okay. From the beginning. Okay. We had to set up -- I guess you call it a U -- with the
mail.  This is the mail that the clerks deliver to the carriers.  And Sabrina helped, you know, us set
this up.  The door for the platform, you have to be sure you keep that area clear, and we did.  And
we moved it back and got it in the right spot.

And everything was fine.  There was not problem.  And I just remember that the pallet,
the way it was sitting, the mail -- the way it was sitting on the pallet, on top of the cardboard,
that's what the problem was.  Then my foot got tripped up in the cardboard.  The cardboard
extended past the pallet, and that's where it all began.

So now that I'm injured, I'm asking you know for some assistance, and basically, it was
like an explosion went off.  They just were totally angry, acting irrational, all over me, and just
treating me like, you know, I had done something, you know, that they hated me for.  And that's
what I saw.

Q. And when you say "they," are you referring to Mr. John Karp?

A. I'm talking about John Karp, and Sabrina was basically following his lead is what she
was doing.  And he was, you know, just everything that she -- it was terrible.

Q. You say he was angry.  How did he express his anger to you?

A. "Look at you," talking to me in disgust.

Q. That's something that he said, "Look at you" in a sarcastic way.

A. Yeah. That kind of way, yes.  You messed up our record. I let him know that I thought
that somebody should have come and helped me, and he was acting like, No.  They -- nobody
should help you kind of thing.  It was like night and day.

It was like Dr. Jekyll and Mr. Hyde, totally flipped over to another side.  He just was
acting -- he was -- because I had an accident, he was just a total irrational individual.

Q.  Did he raise his voice to you?

A. Yes.

Q. Besides -- can you remember anything that he said specifically besides, you, the
record, and look at you?

A. Can I read what I wrote?

Q. Sure.

A. I know he told me -- I remember them -- they asked me to undress, take off my socks
and shoes and that type of thing.  Sabrina was saying she wanted him to get the camera.  You want
me to take pictures? He's agreeing to all this, and he says -- this is the part right here.

He was " . . . standing over me . . . John Karp says 'look at you -- you messed up our
record you fell you don't know what you're doing.'" I mean talking to me, like, just talking down
to me with no -- just total disrespect like I wasn't even a human being.

. . .

Q. And what happened? You tripped over this cardboard? Is that what happened?

A. Right.

Q. And what did you injure? Your foot?

A. Foot and ankle.

(Nashid Dep. 12:10-15:25.)  Thus, Nashid, like Reszutek, recalls a hostile, abrasive and indeed retaliatory response
from Karp to getting injured in the Summit post office.

On October 21, 2004, Pajak filed her second EEO complaint, alleging discrimination on the bases of age, national origin, gender and disability.  (Exh. D, Sturman Aff.)  Her October 2004 EEO complaint was premised upon her workplace injury on September 22, 2004, several disciplinary actions for not working as quickly as younger employees, errors in pay and promotion, and public humiliation by Karp, including instances of humiliation regarding her Polish national origin.   (Exh. D, Sturman Aff.)   Pajak's complaint stated that "the above instances and many more not listed here, describe what I believe to be systematic targeted discrimination against me designed to result in my resignation from the Postal Service, which I refuse to do," and further asserts that " I deserve to be treated with respect and dignity.  I do have [the] right to work without excess stress, harassment, intimidation, threats or bullying by management."  (Exh. D, Sturman Aff.)

On October 27, 2004, when Pajak returned to work from physical therapy, she claims that Karp said to her "it is a shame other people are doing your job while you are faking an injury." (Pajak Cert. ¶ 121.)  Two days later, on October 29, Pajak says Karp called her into his office and accused her of not punching in her time card, and when she denied it, called her a "liar" and the "worst letter carrier in the Summit Post Office," all in the presence of Supervisor Lamers. (Pajak Cert. ¶ 123.)  Pajak claims that on November 1, 2004, at approximately 10:00 a.m., Karp told Pajak that her sickness is "baloney," that she was not to take breaks, and that again he called her a "liar," all in the presence of Sabrina Boxton.  (Pajak Cert. ¶ 124; Pajak Dep. 87:1-88:1.) Again, on November 4, 2004, Pajak states that Karp accused her of being a liar, of failing to punch in her time card, of cancelling her therapy, of failing to take her lunch break, of failing to follow instructions, and that he told Pajak "disciplinary action" would be taken against her.

(Pajak Cert. ¶ 125.)  Thereafter, in the afternoon of November 15, 2004, Pajak informed Karp that her doctor had ordered an epidural injection, to which Karp responded by calling her a liar and saying that he made the wrong decision to keep Pajak in Summit and that he would "vomit" if he had to look at Pajak any longer.  (Pajak Cert. ¶ 126; Pajak Dep. 88:15-16.)  According to Pajak, Karp also threatened to send postal inspectors after her because he believed Pajak was committing fraud by faking her injury. (Pajak Cert. ¶ 126.)

On November 26, during a meeting with Karp and Lamers, Pajak asserts that Karp told her that he would speak very slowly in discussing workplace safety because he said Pajak did not understand English, despite the fact that Karp knew Pajak spoke and understood English as a second language.  (Pajak Cert. ¶ 129.)  In addition, Pajak recalls that on several occasions during 2004 and 2005 Karp mocked Pajak's accent and her manner of speaking.  (Pajak Cert. ¶ 131.)

Pajak also claims she sought time off for one day on December 10, 2004 in order to care for her sick, 75 year old mother, who was recovering from surgery.  (Pajak Dep. 50:13-51:15; Pajak Cert. ¶ 134.)  When Pajak called that morning, her supervisor, McGowan, told her to come in first, to prepare her mail cases, and that she could go and care for her mother afterwards. Pajak refused, responding that her mother lived far away with her sister and needed medication every two hours, so that coming in first was impracticable.  (Pajak Dep. 51:16-19; Pajak Cert. ¶ 134.)  McGowan reportedly told Pajak she needed medical documentation for her absence, which Pajak says she fulfilled in the form of a note from the physician treating her mother.  (Pajak Cert. ¶ 134.)  The Postal Service refused to pay Pajak for this day off because it said her mother was not her "dependant" (Pajak Cert. ¶ 134), and the Postal Service's documentation for this absence states that the absence was "disapproved" and Pajak was "AWOL" and that documentation was needed but was not provided.  (Exh. W, Zatuchni Cert., EEO Investigative File at Exh. 10 p.1.)

Pajak points out that she was treated disparately from co-worker Axelrad, who was granted time off to care for his mother.  (Pajak Dep. 50:13-51:15; Pajak Cert. ¶ 135.)  Axelrad independently confirmed that he was granted time off to care for his mother, and that he had attempted to help Pajak with the process:

> A. My father had dementia, Alzheimer's, and Parkinson's, and I had to take time off for him a couple of times.  And then a year after he had passed, I had to take leave for my mom, who had a hysterectomy. And I also hired, you know, a nurse and whatever. But, you know, and I did get the time, family medical or sick leave, whatever they call it, I don't want to say it wrong.  But I had to use sick leave to care for my dad and my mom and – a year apart, or a little over a year apart.
> Q. And you know that at some point Ms. Pajak was denied –
> A. She needed to take her mom to the eye doctor, I believe, it was something like she couldn't drive or doesn't drive or something, but she was having a vision problem.
> Q. How do you know about that?
> A. Because she was asking me before, how – can I do this? And I said, you have to fill out the form – I don't know the form number.  But anyway, you fill out the thing and on the back if it's for medical documentation, you check off things and you write down, you know, take parent or whatever to doctor's appointment.
> Q. And you say that you instructed her that she would have to fill out this form?
> A. Correct.
> Q. Do you know if she did so?
> A. I believe she did.
> Q. At some point, did she indicate to you that she was rejected?
> A. She did tell me that she was rejected for it.

(Axelrad Dep. 37:24-39:8.)  The foregoing is record evidence that supports Pajak's claims of retaliation.

On December 12, 2004 Pajak filed a third EEO complaint, again alleging discrimination based on age, national origin, gender and disability.  (Exh. E, Sturman Aff.)  Pajak's third EEO complaint set forth that she had been aggrieved by: being retaliated against in receiving a notice of removal following her on-the-job injury in fall 2004; not being paid full-time wages after promotion to full-time carrier; Karp's creation of a hostile work environment for her in verbally abusing her and humiliating her in front of co-workers; being insulted for her use of the uniform

allowance and for her Polish origin, among other complaints.  (Exh. E, Sturman Aff.)  Pajak also

remarked in her third EEO complaint that "*Karp all the time is pressing me to resign from the*

*Postal Service, which I don't want to do*."  (Exh. E, Sturman Aff. (emphasis added).)

     On December 13, 2004, the day after Pajak filed her third EEO complaint, Pajak received

a notice of removal citing Pajak for allegedly failing to work in a safe manner on November 26,

2004 in that she inappropriately stacked tubs in the aisle on that date, which the notice

characterized as "bad housekeeping."  (Exh. W, Zatuchni Cert., EEO Investigative file at Exh. 10

p.1.)  However, review of the dispute resolution decision that eventually rescinded the December

13, 2004 notice of removal undercuts the legitimacy of the Postal Service's basis for the notice:

> The [Dispute Resolution Team] is of the opinion that management's lengthy
> narrative relative to grievant's past and her character is included to convince the
> DRT that she is not to be believed and that management's case should be
> sustained.  The Union's arguments that were left unchallenged created a picture
> that did not convince the DRT that the grievant was working in an unsafe manner
> as instructed.  *Furthermore, the rhetoric offered by management concerning the*
> *validity of the grievant's claims in her EEO complaint as well as the grievant's*
> *claim against the Postmaster were not considered in this decision and should be*
> *addressed in another forum.*

(Exh. W, Zatuchni Cert., EEO Investigative file at Exh. 13 p.4 (emphasis added).)

     There is record evidence that Summit post office employees used derisive names to refer

to Pajak outside of her presence, including "grandma."  Reszutek testified that she personally

heard postal employees Pat Belillo, supervisor Tommy McGowan, and unidentified others refer

to Pajak as "grandma."  (Reszutek Dep. 10:19-11:5.)  Reszutek testified that she heard Pat

Belillo say that Pajak was unable to do her job because she was too old.  (Reszutek Dep. 52:5-

12.)  Postal employee Allan Axelrad also testified that it was true that Summit postal managers

gave Pajak the nickname "grandma" and that Postmaster Karp did nothing to stop this name-

calling, and further confirmed that Pajak was continually referred to as "grandma" up until the

time of Axelrad's deposition.  (Axelrad Dep. 25:8-14.)

Axelrad also testified that Summit postal management helped set Pajak up for failure:

Q. So bottom line, what were they doing? They were giving her more work than she could reasonably handle?
A. Well, it's just tougher to do and it's time consuming. They try to hold you to a street time, which, basically, is only an average. And of course she would exceed that average because she just had so much to deal with on the street. It just compounds your road time when you have to make all these adjustments to be able to physically deliver this mail.
Q. Was it your understanding that they were making it difficult for her to meet to do her route within the so-called specified time that she was supposed to do it within?
A. Yes.
Q. And the way they were doing this was by giving her more mail than usual?
A. It was called "stuffing the case." You stuff everything you can find in the building so it's impossible to do it in that time. "Stuffing the case."
Q. But that makes it sound like she's delivering stuff that she normally would not have to do?
A. Well, it would be tomorrow's mail or the following day's bulk mail, because that has a two-day window on it when it's placed next to your desk.
Q. So you would see them giving her more mail than they had to on that particular day?
A. Well, you're saying "giving her," no. She's delivering more. Other people are stuffing the case. Whether it be in the p.m., the day before, or in the morning of. Some of which being brought in early.
Q. So other employees were instructed to stuff her case?
A. Correct.
Q. And this was something that was – you feel as though she was being targeted in that way? She was being treated differently than every other Letter Carrier?
A. Well, I don't believe she was being stuffed because it was behind.  I believe it was being stuffed to make her day more difficult.
Q. So you saw that as a method – one of the ways – you saw that as a method of targeting Ms. Pajak?
A. Correct. When you say far "targeting," you know, that's kind of a –
Q. It's a strong word but isn't that really what you mean though? That they were purposefully having employees stuff her case to make her life more difficult?
A. Yes.

(Axelrad Dep. 32:1-34:7.)  Axelrad testified that he witnessed the retaliatory step of "stuffing the

case" on Pajak *after* her workplace back injury.  (Axelrad Dep. 35:8-11; *see also* Pajak Dep.

77:10-78:2.)  Axelrad also testified that he had witnessed management retaliate in similar ways against other postal workers in the Summit office.  (Axelrad Dep. 36:23-37:9.)[6]

In making assertions such as that "Karp all the time is pressing me to resign from the Postal Service, which I don't want to do," in her December 2004 EEO complaint, the Court construes Pajak's case as alleging that management's actions amounted to constructive discharge.  "Constructive discharge occurs when an employer unlawfully creates 'working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.'"  *Strickland v. UPS*, 555 F.3d 1224, 1228 (10th Cir. 2009) (quoting *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008)).  Pajak's Title VII claim could be understood as being lodged under two theories:  disparate treatment and hostile work environment.  To prove a disparate treatment claim, a plaintiff "must show she suffered an adverse employment action" for discriminatory reasons.  *Strickland*, 555 F.3d at 1230 n.4 (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).  "Constructive discharge is an adverse employment action." *Id.* (citing *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008)).  To prove a hostile work environment claim, Pajak "must show her workplace was 'permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citing *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005)).

*** 

---

[6] Axelrad testified that he experienced retaliation after speaking with Government counsel for the Postal Service in connection with this civil action, which he explained as "the way [he] was spoken to, the – just the standing behind you, watching you.  You know, just ten extra eyes, drive-bys all the time."  (Axelrad Dep. 50:2-13.)  Axelrad's account of "increased scrutiny" and "a lot more supervision" on the job, even "physical observation[s] on the street . . . [t]wice in the same day" (Axelrad Dep. 51:2-11) coincides with Pajak's similar accounts of numerous observations on the street for which she received no observation report, such as on June 21 and June 24, 2004. (Pajak Cert. ¶¶ 93-94, 102).

For purposes of making out a *prima facie* ADEA claim, Pajak has adduced evidence that she "was subjected to harassment, either through words or actions, based on her age"; "the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile or offensive work environment"; and that there is "some basis for liability on the part of the employer."   *See Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996).

Although a significant portion of Pajak's evidence opposing summary judgment has come in the form of her own affidavit and deposition testimony, she did not frame her 150-paragraph affidavit in a conclusory fashion and it is sufficiently detailed to defeat summary judgment under the Rule 56 standard.  *See Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 470 (8th Cir. 2004) ("A party resisting a properly supported summary judgment motion may not rest upon the mere allegations or denials of the pleadings, but by affidavit or otherwise as provided by Rule 56 must set forth specific facts showing the existence of a genuine issue for trial."); *Galati v. D & R Excavating, Inc.*, 2006 U.S. Dist. LEXIS 28723 (D. Ariz. May 9, 2006) ("To defeat a motion for summary judgment, affidavit testimony unsupported by other evidence in the record must set forth facts sufficiently specific for the factfinder to make the conclusion urged by the proffering party." (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993))).

The Court is cautioned by the law in this Circuit set forth in *Sheridan v. E.I. DuPont de Nemours and Co*., 100 F.3d 1061, 1071 (3d Cir. 1996):  "There will seldom be eyewitness' testimony as to the employer's mental processes.  We have recognized that discrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered.  Cases charging discrimination

are uniquely difficult to prove and often depend upon circumstantial evidence.  This is true in part because discrimination is often subtle.  An employer who knowingly discriminates may leave no written records revealing the forbidden motive and may communicate it orally to no one." (internal citations and quotations omitted); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) ("We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."); *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir. 1995) ("Motions for summary judgment in employment discrimination cases must be approached with added rigor, because credibility and intent are often central issues. Affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.").  Plaintiff's evidence, if believed, sets forth acts that are anything but subtle and could be reasonably construed as hostile and discriminatory.  Pajak has adduced a sufficient quantum of evidence to go to the jury, and the defendant's motion for summary judgment is denied.

## IV.  CONCLUSION

For the foregoing reasons, Postal Service's motion for summary judgment is denied in all respects.  An appropriate order will be entered.

/s/Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.